## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**IN THE MATTER OF THE SEARCH OF
SEIZED ELECTRONIC DEVICES AND
STORAGE MEDIA KNOWN AS:**

**A rose/gold Apple iPhone 10 and a black
Samsung cellular telephone, with IMEI:
354232115446925**

**Case No. 21-mj-08047-JPO**

### APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

I, Joshua Temple, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn depose and state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a component of the U.S. Department of Justice, having been so employed since March 11, 2020.  I am currently assigned to ATF Kansas City Group I, and charged with investigating violations of Federal Firearms, Explosives, and Arson Laws.  I have successfully completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia.  Prior to that, I was employed as a Police Officer with the Baltimore City, Maryland Police Department for approximately two years and an armed federal contractor for the Department of Homeland Security and Federal Protective Services for approximately one and a half years.  I have been a member of the Army Reserves for approximately 15 years, where I am a Military Intelligence Officer and former Military Police Officer.

2.      I have received specialized training in drug and firearms related investigations and instruction pertaining to the laws of search and seizure, and have been involved in numerous

investigations related to the possession of firearms by prohibited persons throughout my law enforcement career.  I am familiar with the enforcement of Federal firearms laws as well as the enforcement of Federal narcotics laws.  My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, informants, as well as others who have knowledge of the distribution and transportation of controlled substances and / or the illegal acquisition and distribution of firearms, and the laundering and concealment of proceeds of firearms trafficking/ drug trafficking; (b) surveillance; and the analysis of documentary and physical evidence. Based on my training and experience as an investigator, I have become familiar with the manner in which firearms traffickers and narcotics traffickers conduct their firearms and narcotics related business, including the methods employed by narcotics dealers to import and distribute narcotics, the manner in which firearms are exported and / or transported illegally, the methods in which individuals collect and launder firearm and narcotic proceeds, and other aspects of firearms and narcotics trafficking. These methods include, but are not limited to the use of wireless communication technology (such as cellular phones), the utilization of computers, electronic mail, counter-surveillance, false or fictitious identities, and the use of coded communications in an attempt to avoid detection by law enforcement. I have been personally involved in numerous investigations involving the unlawful possession of firearms and the possession, manufacture, and distribution of controlled substances, including cocaine, marijuana and heroin.

## IDENTIFICATION OF DEVICES TO BE EXAMINED

3.     I have probable cause to believe a search of the above-listed cellular telephones (a rose/gold Apple iPhone 10 (with unknown identifying numbers) and a black Samsung, with IMEI: 354232115446925, seized from Donnell Hall by law enforcement on March 22, 2021)

will lead to evidence, fruits, and instrumentalities of the offenses listed below and are located upon said premises in the District of Kansas, based upon the following facts:

**FACTS SUPPORTING PROBABLE CAUSE**

The following facts were made known to me by personal observation or from information, which I received, from ATF Special Agents, FBI Special Agents, Kansas City, Kansas Police Officers, and/or from other individuals:

4.     On Tuesday, March 2, 2021, ATF Task Force Officers and Special Agents conducted surveillance at 1933 N. 73rd Terrace, Apartment #8, Kansas City, Kansas 66112. Ongoing investigation led law enforcement to believe this to be the home of Donnell HALL's grandmother, Rosetta Brown, and that HALL resides there. Investigation has also led law enforcement to believe HALL owns a 2011 Black Volkswagen Jetta (VIN: 3VWDZ7AJ9BM353373). Investigators have observed HALL alone inside and operating the same Jetta with several different Kansas temporary registration tags displayed.

5.     On March 2, 2021, at 5:26 p.m., surveillance officers observed and positively identified HALL walking eastbound from around the west side of 1935 N. 73rd Terrace, which is attached to 1933 on the west side of the building. HALL stopped at the entrance of 1935 and briefly spoke to an unidentified individual. HALL then jogged eastbound, past 1933, and then cut northbound around the east corner of the building. HALL then walked toward a black Volkswagen, which was parked to the east of 1933 N. 73rd Terrace. Surveillance officers were unable to confirm any contact between HALL and the Volkswagen's occupants, due to a fence that obstructed their view. The officers were able to see that when HALL reentered their field of vision, the Volkswagen left. HALL walked out of sight and surveillance officers could not confirm his exact destination. Surveillance units followed the Volkswagen and observed the

vehicle's tag (Missouri temporary tag 051W8N), which is registered to Davelle Mitchell, 743 Lafayette Avenue, Kansas City, Kansas.

6.      A short time later, a silver sedan entered the parking lot and parked near where the Volkswagen had previously been parked.  HALL reappeared on foot and approached the stall where the sedan parked.  HALL was again blocked by a fence, but surveillance officers observed what appeared as a brief interaction between Hall and the silver sedan's occupants, as no one entered or exited the sedan.  HALL walked back toward 1933, out of officers' sight, and the sedan left.  The sedan's license plate (Kansas 180JMC) returned as registered to Justin Scott, 2921 N. 55th Street, Kansas City, Kansas, on a 2004 Chevrolet Aveo.

7.      Shortly thereafter, a red sedan arrived and parked in the same area as the previous two vehicles.  HALL again appeared and officers observed what they believe to be a brief interaction between HALL and the red sedan's occupant(s).  After a few minutes, HALL walked back toward 1933 and the red sedan left.  The red sedan's license plate (Kansas 544NBJ) returned as registered to Anthony Kenney, 2627 N. 34th Street, Kansas City, Kansas 66104, on a 2006 Chevrolet Monte Carlo.

8.      The above listed actions, witnessed by surveillance officers, all took place within a two-hour timeframe.  The vehicles HALL interacted with all parked in roughly the same spot, the occupants never exited the vehicles, and HALL would come out to them within moments of the vehicles' arrival.  HALL would then engage in a brief interaction with the vehicles' occupants, the vehicles would leave the area, and HALL would return to the 1933 apartment complex.  Investigators believe this pattern of activity, observed during surveillance on March 2, 2021, is consistent with drug distribution activity and recurring drug customer/dealer interactions.

9.      On March 4, 2021, members of the ATF conducted surveillance on HALL at 1933 N. 73rd Terrace #8, Kansas City, Kansas.  At approximately 4:00 p.m., a silver Ford Escape backed into a parking stall outside of 1933 N. 73rd Terrace, in the same area officers had observed HALL meet with previous vehicles.  Officers observed the silver Escape's male driver appeared to be looking down.  It appeared the driver was messaging on his phone.  Based on training and experience, it is common during drug transactions for buyers to arrive at an agreed meeting spot and then communicate with the dealer to inform them they are there.

10.      At approximately 4:04 p.m., officers observed HALL walking east from the 1933 complex to the silver Escape.  HALL spoke with the male driver while standing outside the driver's door.  HALL reached in the driver's window and appeared to pass something to the Escape's driver.  After a few seconds, HALL walked back to the building and the silver Escape left.  The incident was captured on video and recorded.

11.      Surveillance units in the area followed the silver vehicle, a 2018 silver Ford Escape (KS Tag 561NHB).  Soon thereafter, Kansas City, Kansas Police Department (KCKPD) officers initiated a traffic stop on the vehicle.  When the officers approached the vehicle, they detected an odor of unburnt marijuana emitting from the vehicle.  Officers later searched the vehicle, but did not locate any marijuana or other narcotics.

12.      At approximately 4:45 p.m., surveillance officers were preparing to move positions, as a recently-arrived vehicle had blocked their line of sight. While attempting to move, officers observed HALL standing outside on the east side of 1933 N. 73rd Terrace, between the parking lot and the building.  HALL appeared to be looking around for someone.  Approximately two minutes later, officers observed a black pickup truck pull into a parking stall, at an angle south of the officers.  The officers observed HALL walk up to the truck's driver side window.

After a minute or two, the truck left the area.  Officers observed HALL walk back towards 1933.

Surveillance officers observed HALL holding U.S. currency in his left hand as he walked

towards the building.  After the truck departed, surveillance officers chose not to follow the truck

or attempt a stop due to limited resources of marked vehicles at the time and the reckless manner

in which the truck left the parking lot.

13.     The above listed actions, witnessed by surveillance officers, all took place within

an hour. The vehicles HALL interacted with all parked in roughly the same spot, the occupants

never exited the vehicles, HALL appeared shortly after the vehicles arrived, and HALL's

interactions with the occupants were brief.  Investigators believe this pattern of behavior on

March 4, 2021 is consistent with drug distribution activity.

14.     On March 18, 2021, law enforcement conducted surveillance on HALL at 1933

N. 73rd Terrace, Apt. 8, Kansas City, Kansas.  Surveillance units were positioned in the parking

lot on the east side of the 1933 complex, where they had witnessed the other previous

transactions take place.  Surveillance units observed a silver, four-door sedan back into a parking

stall, in the same area where HALL previously engaged with others.  Moments later, officers

observed HALL exit the vehicle's rear passenger's side and walk toward 1933, out of view.  A

short time later, HALL returned to the silver sedan's rear passenger door, carrying a red

backpack.  HALL opened the door and leaned inside for a few minutes.  HALL then

momentarily went back into 1933 (the apartment complex containing Apt. 8) with the red

backpack, came back outside (still carrying the red backpack), and walked directly to his parked

black Volkswagen Jetta.  Officers noted the Jetta was backed in, under the covered parking stalls,

along the east side of the parking lot.  HALL sat in his vehicle, for approximately eight minutes,

before departing northbound in the Jetta.  Surveillance units followed HALL for a period of time

before losing sight of him.

15.     On March 19, 2021, law enforcement conducted mobile surveillance on HALL. Officers observed HALL leave the 1933 complex in his black Volkswagen Jetta, bearing Kansas temporary registration tag C608417.  Prior to HALL's departure, officers observed him with the same red backpack.  Officers conducted a mobile surveillance operation and followed HALL's Jetta.  Officers observed HALL stop at 26th and Quindaro in Kansas City, Kansas. An unknown black male exited an unknown house at the intersection and approached HALL's vehicle.  After a brief interaction between the two, the unknown male walked back to the residence.  HALL then immediately drove off.  A short time later, HALL stopped at the Fast & Friendly Convenience Store and Gas Station, at 17th and Minnesota, Kansas City, Kansas.  While parked at the pumps, officers observed an unknown black male walk up to HALL's passenger window.  Officers then observed HALL conduct what appeared to be a hand-to-hand transaction with the male.  HALL never exited his vehicle or purchased gas at the pump.  After the unknown male left, HALL pulled out of the parking lot.  Based on training and experience, investigators believe these interactions reflect HALL conducted hand-to-hand drug transactions.  Surveillance units continued to follow HALL before losing sight of him.

16.     On March 22, 2021, law enforcement conducted an open source social media search for HALL.  Investigators located Donnell Hall on Facebook and found his account was open to the public.  Investigators located a picture, posted on Facebook by HALL on February 27, 2021.  The Facebook photo showed HALL posing with the same red backpack observed during surveillance operations.  Investigators also located a Facebook picture, posted on Facebook by HALL on March 21, 2021, showing HALL with what appears to be a handgun in his back left pants pocket.

17.     On March 22, 2021, members of the FBI, ATF, and Kansas City Kansas Police Department (KCKPD) were looking for Donnell HALL in order to serve an arrest warrant out of Wyandotte County, Kansas, District Court for Felony Fleeing and Eluding.  At approximately 1:30 p.m., law enforcement initiated a surveillance operation on HALL, and his parked black Jetta, at 1933 N. 73rd Terrace, Apt. 8, Kansas City, Kansas.

18.     At approximately 3:41 p.m., a silver 2005 Ford 500 sedan (Kansas Tag: 103NTJ) backed into a parking spot outside of 1933 N. 73rd Terrace, Kansas City, Kansas.  This appeared to be the same silver sedan surveillance officers observed HALL in on March 19, 2021. Investigators observed HALL exit the sedan's front passenger seat.  With the passenger door still open, HALL then turned toward the sedan's driver and appeared to engage in a brief conversation.  HALL then climbed back into the passenger seat and reached into the rear of the vehicle (as if trying to grab something).  At this time, the arrest team moved in.  Officers were in unmarked vehicles with flashing red and blue lights.  Agents and officers wore vests displaying "POLICE" or their respective agency's name.  HALL then sat down in the passenger seat, started to close the passenger door, then quickly opened it back up with his hands displayed in compliance.  Law Enforcement placed HALL under arrest and detained the sedan's driver, Steven Williams (DOB: 3/1/1995).  During a search incident to HALL's arrest, officers recovered the following from HALL's person: a handgun holster from his waistline, two cellular phones from his pocket (a rose-gold Apple iPhone 10 and a black Samsung (IMEI: 354232115446925), a small plastic bag containing approximately two grams of suspected synthetic marijuana (later field tested negative for the presence of THC), and $871.40 in U.S. Currency.

19.     While standing outside the vehicle, officers observed, in plain view, a firearm on

the sedan's front passenger's seat.  Officers also observed, in plain view, the previously-mentioned red backpack on the sedan's front passenger floor board.  Officers noted the smell of marijuana emitting from inside the vehicle.  Based on the odor of marijuana and plain view of the firearm, law enforcement conducted a search of the vehicle.

20.     From the sedan's front passenger seat, where HALL was first observed by law enforcement, officers recovered a Glock, Model 20 GEN 4, caliber 10mm handgun, with serial number BBLR494.  The firearm was loaded with an extended magazine, containing 30 rounds of ammunition, and one round in the chamber.  HALL also had an empty appendix holster in his waistband, which investigators later determined the firearm fits into.  ATF later conducted an interstate nexus on the Glock handgun and determined the firearm was not manufactured in Kansas.  As such, the firearm would have traveled in interstate and/or foreign commerce prior to being found in the defendant's possession.

21.     Officers conducted a search of the red backpack, located on the sedan's front passenger floor board, in a location officers first observed HALL was seated.  Inside the backpack, officers located an additional 10mm Glock magazine containing 14 rounds of ammunition.  Officers also located a Glock .40 caliber extended magazine, with 28 rounds of .40 caliber ammunition, inside the red backpack's main pouch.  Additionally within the backpack, officers located a mason jar with approximately 27 grams of suspected marijuana.  Investigators later conducted a field test of the suspected marijuana, which tested positive for the presumptive presence of THC.  Officers also located an electronic scale, numerous plastic sandwich bags, and another plastic bag containing approximately 70 grams of suspected synthetic marijuana inside the backpack.  Officers later conducted a field test of the suspected synthetic marijuana, but did not receive a positive presumptive indication for the presence of THC.

22.     During a later post-*Miranda* interview, HALL said he sells marijuana to make ends meet and does not smoke marijuana.  HALL did not admit to possessing the firearm, but said if he carried a firearm, it would be for protection only.

23.     Officers located the following additional contraband in the vehicle, which was later claimed by the driver, Steven Williams:

a.   A Glock, Model 26 GEN 4, caliber 9mm handgun, serial number ZRE869, with an extended magazine and ammunition

b.   A large plastic bag, located behind the front passenger seat, containing:

   i.   six packages of edible marijuana;

   ii.   a plastic bag, containing approximately 23 grams of suspected marijuana, which later tested positive with a presumptive presence of THC;

   iii.   a plastic bag, containing approximately 20 grams of suspected marijuana, which later tested positive with a presumptive presence of THC;

c.   Two labeled "cannabis flower" bags, located in the center console of the vehicle;

d.   Two 9mm Glock magazines, located in the center console of the vehicle;

e.   A digital scale, located in the center console of the vehicle; and

f.   Assorted cut plastic bags, located on the driver's side floorboard.

24.     A review of HALL's criminal history shows he has two prior felony convictions in the state of Kansas.  In 2021, HALL was convicted of felony Distribution of Marijuana, in Johnson County, Kansas, District Court Case No. 20CR1687; and, in 2015, HALL was convicted of felony Possession of Cocaine, in Wyandotte County, Kansas, District Court Case No. 2014CR0998.  These were both felony crimes that HALL knew he had been convicted of, because he was sentenced to more than twelve months in custody.  As such, HALL was

prohibited from possessing the Glock, Model 20 GEN 4 firearm on March 22, 2021.

25.     Based on your Affiant's training, experience, observations during surveillance, and HALL's statements, investigators believe HALL is a marijuana distributor.  On the date of his arrest, HALL possessed approximately 27 grams of marijuana (an amount consistent with distribution), plastic bags, and a digital scale.  Based on training and experience, drug dealers use plastic bags to distribute marijuana for sale and utilize digital scales to weigh and package their product for distribution. The U.S. Currency recovered from HALL is also indicative of monies received in distributing drugs.  It is also your affiant's experience that drug traffickers often carry firearms to protect themselves from rival dealers and from being robbed during illicit transactions.

26.     Based upon the aforementioned facts, I believe the rose/gold Apple iPhone 10 (with unknown identifying numbers) and the black Samsung, with IMEI: 354232115446925, seized from Donnell Hall by law enforcement on March 22, 2021, contain data and information that will be fruits, evidence, and/or instrumentalities of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute marijuana); Title 18, United States Code, Section 924(c)(1)(A) (possession of a firearm in furtherance of drug trafficking); and Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) (felon in possession of a firearm).

27.     I know that retrieving names and the respective phone numbers associated with them, would assist in further identifying relationships and identities of subjects associated with this investigation.  I know that subjects utilize cellular phones equipped with digital cameras and use such devices to photograph firearms and subjects possessing or "posing" with firearms and drugs.  I know that subjects often photograph themselves and other subjects, and that these photographs can be sent and received electronically from cellular phone to cellular phone.  I also

know that subjects utilize mobile phones to communicate via text messaging.  I know that subjects involved in the distribution of controlled substances often keep lists, ledgers, and records of their dealings.  Based upon my training and experience, examining data stored on cellular telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the device, how the device was used, the purpose of its use, and when it was used.

28.     I hereby request the Court's permission to conduct a full and complete forensic phone examination of the cellular telephones, seized by law enforcement on March 22, 2021, and further described as a rose/gold Apple iPhone 10 (with unknown identifying numbers) and a black Samsung, with IMEI: 354232115446925, which is currently in the custody of ATF personnel, within the District of Kansas, at the signing of the search warrant.  The requested examination includes a search of photographs, e-mails, "address books" or "contacts" lists, call logs, audio files, contact lists, calendars, stored image and video files, internet history, location data, and SMS and MMS text messaging related to drug possession and distribution, and unlawful firearm possession.

29.     Based on your affiant's training and experience, your affiant knows the following:

a.     Persons involved in the distribution of controlled substances utilize cellular telephones to conduct their illicit transactions. This would include contacting customers, sources of supply, and those assisting in the distribution of controlled substances.

b.     Persons involved in the distribution of controlled substances commonly maintain telephone contact lists or directories.  These often include names, nicknames, email addresses, and contact numbers of those involved in illicit activity.

c.     Those involved in the distribution of controlled substances conduct their illicit

trade via internet and cellular phone in various forms, including conversations, voice messages, text messages, instant messaging, various messaging applications, and social media.  It is also common for drug traffickers to carry multiple cellular phones and switch the phone frequently.

d.      Persons involved in the distribution of controlled substances often take photographs of themselves with associates, as well as photographs of them with drugs and weapons.

e.      Those involved in the distribution of controlled substances use and possess firearms to protect themselves, the illegal proceeds, and controlled substances from other others.

f.      Persons who are prohibited from possessing firearms utilize cellular telephones to contact persons for the purpose of obtaining and purchasing firearms they cannot legally purchase from a Federal Firearms Licensee.

<u>TECHNICAL TERMS</u>

30.     Based on my training and experience, your affiant uses the following technical terms to convey the following meanings:

31.     Wireless/cellular telephone: A wireless telephone (or mobile phone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books" or "contacts" lists; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video;

storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

32.     Geotagging: Geotagging is a feature that geographically tags the location and time of a photograph taken. The data saved at the time the image is captured is usually placed in a JPEG file using the exchangeable image file format (EXIF). The metadata within the EXIF is then readable by numerous photo editing software programs. Simply defined, metadata contains data that describe a file. In the case of EXIF metadata, it is data that describes data used by digital cameras, digital imaging software, and others to describe the particular attributes of a digital image file. The tagging information is added to photographs or video at the time it is taken if the geotagging tool is enabled in the camera settings. Programs such as Google Maps can be used to track the location a photograph or video was taken using the metadata encoded in photograph or video.

33.     SIM card: SIM cards, or Subscriber Identity Module cards, or Subscriber Identification Modules, are plastic cards that have an embedded circuit on them that stores personal information of the account holder, including his or her phone number, address book, text messages and other data. A SIM card user can easily change cellular phone handsets by simply removing the SIM card from one handset and placing it in another compatible handset. In addition to the SIM card's ability to identify the cell phone user's phone number, contacts list, and text messages, the SIM card stores information used by the wireless carrier to identify the subscriber.

34.     SD Cards: SD cards are a type of storage medium that come in various sizes. Some wireless telephones contain removable SD cards, on which the phone can store data, including but not limited to pictures, video, audio recordings, and contact lists.

35.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

36.     GPS: A GPS navigation device uses Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of multiple satellites orbiting the earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

37.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touchscreen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

38.     IP Address: An Internet Protocol address (or simple "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

39.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

40.     Digital camera/SD Card/Memory Stick:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards, SD cards, memory sticks, or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

41.     Based on my training, experience, and research, I know that the listed cellular telephones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

<u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

42.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some time on the device. This information can sometimes be recovered with forensics tools.

43.     There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons:

44.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person

"deletes" a file on a storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

45.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

46.     *Forensic evidence.* This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the listed cellular telephones were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the listed cellular telephones because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and sequence in which they were created.

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the listed cellular telephones consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

19

48.  *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

49.  I hereby request the Court's permission to conduct a full and complete forensic phone examination for all records, data, and information on the listed cellular telephones and SIM cards described in the affidavit which relate to violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute marijuana); Title 18, United States Code, Section 924(c)(1)(A) (possession of a firearm in furtherance of drug trafficking); and Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) (felon in possession of a firearm) and probable cause exists to believe the information and items listed herein will be found secreted in the listed cellular telephones, including:

   a.  Lists of customers and related identifying information;

   b.  Any information recording meetings, deliveries, the schedule and travel of the parties involved in drug trafficking;

   c.  Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages;

   d.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   e.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   f.  Device ownership and user information, including evidence of user attribution showing who used or owned the Device at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   g.  Photographs, images, and videos of drug trafficking activity, drug trafficking associates, instrumentalities or proceeds of drug trafficking, and firearm use and possession in connection with such; including stored information related to the date, time, user and owner of the device, and location of the image generation;

    h.  Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool. Including any identification information related to the use and ownership of the devices.

50.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

    The foregoing is true and correct to the best of my knowledge and belief.

                                   Special Agent Joshua Temple
                                   Bureau of Alcohol, Tobacco, and Firearms

    Sworn to and attested by affiant via telephone after being submitted to me by reliable electronic means on March 26, 2021.

                                   Honorable James P. O'Hara
                                   Chief United States Magistrate Judge
                                   District of Kansas